```
Keith M. Lundin
U.S. Bankruptcy Judge
Dated: 03/16/11
```



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SABRE DEFENCE INDUSTRIES LLC, ) | CASE NO. 3:11-01431 |
| ) | CHAPTER 11 |
| DEBTOR. ) | JUDGE LUNDIN |
| ) | |

**ORDER AND NOTICE APPROVING THE SALE OF SABRE'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND GRANTING CERTAIN RELATED RELIEF**

Upon the Expedited Motion of the Trustee for (I) Entry of an Order (A) Establishing Bidding and Auction Procedures Related to the Sale of Certain Assets of Sabre Defence Industries LLC and Sabre Defence Holdings, LLC (collectively, "Sabre"); (B) Scheduling a Preliminary Hearing upon any Objections Approving Bid Procedures; (C) Scheduling a Final Sale Hearing Approving the Sale of the Assets; (D) Approving Form and Manner of Notice of All Procedures, Protections, and Agreements; and (E) Granting Certain Related Relief; (the "Bid Procedures Order") (II) Entry of an Order Approving the Sale of the Assets of Sabre Defence Industries, LLC and Sabre Defence Holdings, LLC Free and Clear of all Liens, Claims, Encumbrances, and Interests; (III) Approving the Agreed Order Settling Claims of Manroy USA, LLC and Cadence Bank, N.A. Relating to UCC Sale and Assets Pursuant to FRBP 9019; and (IV) Approving Payment to Cadence Bank, N.A. for its Administrative Expenses (the "Motion"); and upon the Preliminary Hearing on the Motion having been held on March 2, 2011; and upon

Page 1 of 4

the Bid Procedures Order having been entered on March 2, 2011, which authorized the Auction and bidding procedures for the sale of the Assets[1]; and upon the Auction of the Assets having been held on March 10, 2011, where appearances were made and bids submitted by Colt Defense, LLC, a Delaware limited liability company, and by Manroy USA, LLC, an Alabama limited liability company ("Manroy"); and upon the submission by Manroy (the "Successful Bidder") of the highest and best bid of Four Million, Nine Hundred and Fifty Thousand Dollars ($4,950,000) for the Assets; and upon the Objection to the Motion by Starwin Industries, Inc., which was resolved as set forth in the Expedited Order Granting Expedited Motion to Assume and Assign Executory Contracts Pursuant to 11 U.S.C. § 365(a) and (f); and upon the Sale Hearing having been held on March 15, 2011, it is hereby

## FOUND AND DETERMINED THAT:

A.   The Sale of the Assets to the highest bidder at the Auction Sale for the Purchase Price of Four Million Nine Hundred and Fifty Thousand Dollars ($4,950,000) (the "Purchase Price") pursuant to the terms as set forth in the attached Asset Purchase Agreement is in the best interests of the estate.

B.   The Auction was conducted in accordance with the Bid Procedures Order.

C.   The attached Agreement of Sale (the "Asset Purchase Agreement") has been modified from the prior version filed with the Court only to reflect the new Purchase Price and execution date.

D.   Pursuant to the Asset Purchase Agreement, Manroy has had reasonable access to the Assets, and to the books and records of Sabre, and has conducted all due diligence which it deems appropriate to its line of business under applicable law, to acquire the Assets under and close the transactions contemplated by the terms of the Asset Purchase Agreement.

---

[1] The term "Assets" means the Acquired Assets under the Asset Purchase Agreement and the Motion.

E. The Assets are sold, transferred, assigned, conveyed and delivered to Manroy "AS-IS, WHERE-IS," and upon entry of this Order, there is hereby vested in Manroy good and marketable title to the Assets, free and clear of all liens, encumbrances, equities, claims, and obligations to other persons, of whatever kind and character. Seller makes no warranties other than as to marketable title, and expressly disclaims any and all warranties as to the condition, operation, performance, or use of the Assets for any purpose.

~~F. Manroy is not nor shall it be deemed a successor-in-interest of Sabre for any purpose under state or Federal and shall not be subject to (i) any criminal, civil, or administrative penalties or fines; (ii) the imposition of export or import compliance programs or procedures; (iii) debarment; or (iv) the loss of any import or export privileges (collectively, "Trade Liabilities") by an agency of the United States as a result of either (i) its purchase of the assets of Sabre, or (ii) any acts, omissions, or violations of law or regulation on the part of Sabre or its members, managers, officers, employees, or agents. Specifically, but without exclusion, Manroy shall not assume, acquire, or have imposed upon it any Trade Liabilities pursuant to the Arms Export Control Act (22 U.S.C. § 2751 et seq.); the International Traffic In Arms Regulations (Title 22, Parts 120-130 of the Code of Federal Regulations ("CFR"); the International Emergency Economic Powers Act (50 U.S.C. § 1701 et seq.); the Export Administration Act (50 App. U.S.C. § 2401 et seq.); the Export Administration Regulations (Title 15, Parts 730-774 of the CFR); the Mutual Security Act (22 U.S.C. § 1750 et seq.); or Title 27, Parts 447, 478, or 479 of the CFR.~~

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. The sale of the Assets of Sabre to the Successful Bidder, as set forth in the attached Asset Purchase Agreement, as modified, is hereby approved.

2. The Successful Bidder shall acquire the Assets free and clear of all liens, claims and interests, with any such liens, claims or interests to attach to the proceeds of the sale in the same order of priority.

3. No additional notices shall be required to any party except as required by further order of the Court.

4. This Order shall be binding on and inure to the benefit of the Successful Bidder and its affiliates, successors and assigns, and to the Trustee, and his successors and assigns.

5. The 14 day stay as set forth imposed by Rule 4001 of the Federal Rules of Bankruptcy Procedure be and is hereby waived and the automatic stay is immediately terminated with regards to the Auction sale and the binding effect of this Order.

6. This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon entry.

IT IS SO ORDERED.

SUBMITTED FOR ENTRY BY:

**MANIER & HEROD, P.C.**

/s/ Michael E. Collins
Michael E. Collins (#016036)
Scott C. Williams (#021757)
Neesha S. Hetcher (#026579)
One Nashville Place, Suite 2200
150 Fourth Avenue North
Nashville, TN 37219
(615)244-0030
Fax: (615)242-4203
mcollins@manierherod.com
nhetcher@manierherod.com

# AGREEMENT OF SALE

## BY AND BETWEEN

MICHAEL E. COLLINS, Chapter 11 Trustee in Bankruptcy
for SABRE DEFENCE INDUSTRIES, LLC, a Tennessee limited liability company
("Seller")

and

MANROY USA, LLC, AN ALABAMA LIMITED LIABILITY COMPANY
("Purchaser")

Dated: March 10, 2011

567506

# AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** (this "Agreement"), is made and entered into this 10th day of March, 2011, by and between Michael E. Collins, Chapter 11 Trustee ("Trustee" or "Seller") in Bankruptcy for Sabre Defence Industries, LLC, a Tennessee limited liability Corporation ("SDI"), and Manroy USA, LLC, an Alabama limited liability company ("Purchaser"), each of the foregoing collectively, the "Parties."

## RECITALS

WHEREAS, SDI is in the business of manufacturing and selling at wholesale, various machine gun firearms, and major component parts thereof in the United States, Europe and elsewhere (the "Business"); and

WHEREAS, SDI is a wholly-owned subsidiary of Sabre Defence Holdings, LLC ("SDH"), which has asserted an ownership interest in some or all of the equipment used by SDI in its Business operations (SDI and SDH being collectively referred to hereafter as "Sabre"); and

WHEREAS, on February 15, 2011 (the "Petition Date"), SDI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court"), case no. 11-01431 (the "Case"); and

WHEREAS, Michael E. Collins was appointed Chapter 11 Trustee of SDI on February 23, 2011; and

WHEREAS, prior to the Petition Date, the Purchaser bid at a certain auction sale (the "UCC Sale") to acquire the assets of Sabre; and

WHEREAS, in connection with the UCC Sale, the Purchaser deposited with Cadence Bank the sum of $2.275 Million (the "UCC Sale Deposit"), which is currently being held by Ernest B.. Williams IV, PLLC as escrow agent in an interest bearing escrow account; and

WHEREAS, the Purchaser has agreed to release all claims in connection with the UCC Sale in consideration of $50,000 to be paid at Closing; and

WHEREAS, Seller desires to sell to Purchaser all of the Acquired Assets of Sabre, and Purchaser desires to purchase all of the Acquired Assets upon the terms and conditions set forth in this Agreement; and

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Acquired Assets pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Auction"); and

WHEREAS, the execution and delivery of this Agreement, and the Seller's ability to consummate the transactions contemplated herein are subject to, among other things, the Bankruptcy Court's entry of an Order approving the same pursuant to Sections 363 and 365 of the Bankruptcy Code and the Trustee obtaining authority to sell the assets of SDH.

567506

NOW THEREFORE, in consideration of the premises, and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.

## SALE AND PURCHASE

1.01    Agreement to Offer Stalking Horse Bid.  Purchaser has submitted to Seller, and, subject to its receipt of a Higher and Better Offer at Auction (defined below), Seller has accepted, a bid from Purchaser to purchase the Acquired Assets for the Purchase Price set forth in this Agreement (the "Stalking Horse Bid").  Seller has agreed to seek an Order from the Bankruptcy Court approving a procedure for soliciting bids from additional Qualified Bidders, approving the Stalking Horse Bid, approving this Agreement, and authorizing the consummation of the transactions contemplated herein, subject to Seller's acceptance of a Higher and Better Offer from a Qualified Bidder at the Auction.

1.02    Qualified Bid; Higher and Better Offer; Auction.  Within fifteen (15) days of the execution of this Agreement, Seller has agreed to conduct an Auction at which time Seller will determine, in the Seller's discretion, which bid, if any, shall be accepted as the Higher and Better Offer.  A "Qualified Bid" shall mean and include any offer to purchase the Acquired Assets for cash, , submitted prior to the Bid Deadline and containing a bid price equal to or greater than the Purchase Price under the Stalking Horse Bid.  The term "Higher and Better Offer" shall mean and include any Qualified Bid which contains terms which the Seller deems, in Seller's discretion, better than those terms set forth in the Stalking Horse Bid and this Agreement.  The term "Qualified Bidder" shall mean an individual or entity that has qualified to bid pursuant to auction and bidding procedures approved by the Bankruptcy Court.

1.03    Purchase and Sale.  Upon and subject to the terms of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to Purchaser, and Purchaser shall purchase, free and clear of all liens, mortgages, or encumbrances of any kind, all right, title and interest of Seller, in and to or under the following (herein collectively called the "Acquired Assets"):  all of the properties and assets of Seller (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for  use in the operation of the Business, as the same shall exist on the Closing Date, which, without limiting the foregoing, shall include: (a) all inventory, equipment, chattel paper, contracts, general intangibles (including payment intangibles), leases, licenses, permits, documents and intellectual property; (b) all contracts between Sabre and the United States government and any division thereof together with all technical data plans and the right to use any proprietary technology in connection therewith (all subject to transfer and novation requirements under applicable laws, rules and regulations) ; (c) all instruments, letter of credit rights  and accounts receivable, documents, bills of lading, warehouse receipts; and (d) all rights under and pursuant to all warranties,

567506

representations and guarantees made by suppliers, manufacturers, contractors or others to the extent relating to operation of the Business or affecting any of the Acquired Assets.

1.04 Excluded Assets. The Acquired Assets shall not include any and all avoidance causes of action set forth in sections 544, 547 and 548 of the Bankruptcy Code, any claims or causes of action relating to contracts breached by counter-parties to Sabre prior to the Petition Date, any claims against Steyr for breach of any contract and any inventory held relating to a Steyr contract, any claims or causes of action against affiliates, insiders or employees relating to acts or omissions occurring prior to the Closing, and all assets listed on the *Schedule 1.04* which shall include all assets that are leased from or collateral to Tennessee Commerce Bank or Central Leasing, and any other assets set forth thereon (collectively referred to as the "Excluded Assets").

1.05 Assets Transferred "As-Is". The Purchaser acknowledges that the Acquired Assets are being sold, transferred, assigned, conveyed and delivered by Seller to Purchaser "AS-IS, WHERE-IS." Upon the sale, transfer, assignment, conveyance and delivery of the Acquired Assets to Purchaser hereunder, there will be vested in Purchaser good and marketable title to the Acquired Assets, free and clear of all liens, encumbrances, equities, claims, and obligations to other persons, of whatever kind and character. Seller makes no warranties other than as to marketable title, and expressly disclaims any and all warranties as to the condition, operation, performance, or use of the Acquired Assets for any purpose.

1.06 Purchase Price. The purchase price to be paid by Purchaser to Seller for the Assets shall be Four Million, Nine Hundred and Fifty Thousand Dollars ($4,950,000) (the "Purchase Price"), payable in cash at Closing.

1.07 Release. In exchange for the payment of Fifty-Thousand Dollars ($50,000) and other good and valuable consideration to occur through the closing of the sale of the Assets:

a. The Purchaser hereby releases, remises, and forever discharges SDI, SDH, Cadence Bank, N.A, Michael E. Collins (collectively, the "Seller Released Parties") and each of the Seller Released Parties' agents, affiliates, attorneys, personal representatives, heirs, insurers and assigns, employees, partners, and/or affiliates of those entities, and each of them, of and from any and all known and unknown claims, debts, liabilities, accounts, covenants, agreements, demands, obligations, costs, expenses, actions or causes of action of every nature, character or description, without limitation, at law, in equity or otherwise, which the Purchaser or any person claiming or purporting to claim by, through or under the Purchaser now has, has heretofore had or may hereafter at any time have against the Seller Released Parties and their agents, affiliates, attorneys, personal representatives, heirs, employees, and/or their partners as a result of any claims which were asserted or could have been asserted in or with respect to the UCC Sale, including, without limitation, any claims arising in connection to ownership, damages, title, or any attempt to enforce same, all of which claims are referred to hereinafter as the "Claims"; and the Purchaser agrees that it shall forever refrain

567506

and forebear from commencing, instituting or prosecuting any lawsuit action or proceeding, judicial, administrative, or otherwise, or otherwise attempting to collect or enforce any of the Claims which are released and discharged herein; and the Purchaser agrees to indemnify and hold harmless the Seller Released Parties , their respective agents, affiliates, attorneys, personal representatives, heirs, employees, partners, insurers and assigns, from and against any and all Claims which are released herein, as well as any expense or other cost, including attorneys' fees, incurred in the defense thereof; and accepts and assumes the risk that laws and/or facts relied upon by them in entering into this Agreement, and, specifically, the release herein contained, may turn out to be other or different from those now known or suspected, and agree that this release is not subject to termination or revision by virtue of any such differences in law or fact.

b. The Seller hereby releases, remises, and forever discharges Purchaser (collectively, the "Purchaser Released Parties") and each of the Purchaser Released Parties' agents, affiliates, attorneys, personal representatives, heirs, insurers and assigns, employees, partners, and/or affiliates of those entities, and each of them, of and from any and all known and unknown Claims; and the Seller agrees that it shall forever refrain and forebear from commencing, instituting or prosecuting any lawsuit action or proceeding, judicial, administrative, or otherwise, or otherwise attempting to collect or enforce any of the Claims which are released and discharged herein; and the Seller agrees to indemnify and hold harmless the Purchaser Released Entities, their respective agents, affiliates, attorneys, personal representatives, heirs, employees, partners, insurers and assigns, from and against any and all Claims which are released herein, as well as any expense or other cost, including attorneys' fees, incurred in the defense thereof; and accepts and assumes the risk that laws and/or facts relied upon by them in entering into this Agreement, and, specifically, the release herein contained, may turn out to be other or different from those now known or suspected, and agree that this release is not subject to termination or revision by virtue of any such differences in law or fact.

## ARTICLE II.

### ESCROW

2.01 Escrow. Ernest B. Williams IV (the "Escrow Agent") shall maintain the UCC Sale Deposit in the amount of $2.275 Million plus accrued interest (the "Escrowed Funds") and hold the same in escrow pursuant to the terms hereof. At the conclusion of the Auction, in the event that Purchaser is the Successful Bidder, all of the Escrowed Funds shall be delivered immediately to the Trustee. The Escrowed Funds shall be held in an interest bearing account. Any interest earned on the Escrowed Funds shall be treated as a credit toward the Purchase Price to be paid hereunder.

567506

2.02 Disbursements from Escrow. Unless refunded to Purchaser pursuant to this Section 2.02, at Closing, upon written confirmation from Seller of Purchaser's satisfaction of all obligations and conditions hereunder, and upon written confirmation from Purchaser of Sellers' satisfaction of all obligations and conditions hereunder, subject to the occurrence or waiver of any other conditions precedent to Closing, the Escrowed Funds shall be applied to the Purchase Price. The Trustee shall refund the Escrowed Funds to Purchaser in the following circumstances:

a. In the event the Purchaser is not the Successful Bidder at the Auction; or

b. In the event the Auction does not occur within fifteen (15) days of the execution of this Agreement.

## ARTICLE III.

## CLOSING

3.01 Closing Date. The consummation of the transactions contemplated by this Agreement shall occur no later than five (5) days following the date of the Auction. The order approving sale shall specify that the 14-day stay pursuant to Federal Rule of Bankruptcy Procedure 6004(h) shall not apply.

3.02 Seller's Obligations at Closing. At the Closing, Seller shall do the following:

a. Execute, acknowledge and deliver to Purchaser a bill of sale (the "Bill of Sale") pursuant to which Seller shall convey to the Purchaser the Acquired Assets.

b. Deliver possession of the Acquired Assets to Purchaser.

c. Execute and deliver such other documents as the Purchaser may reasonably require in connection with the Closing including, without limitation, a closing statement.

d. Make reasonably available to Purchaser originals, or, if any originals are not in Seller's actual possession copies, certified as being true, correct and complete in all material respects, of any and all books, documents and records relating to ownership and operation of the Acquired Assets, including, but not limited to service contracts, warranties, and all plans, governmental approvals, licenses, permits, technical data plans, drawing and specifications and other contracts and agreements relating to the ownership and operation of the Acquired Assets.

e. Provide immediate access to any facilities in or upon which the Acquired Assets may be located.

f. Assist Purchaser in the transfer of all firearms, including by execution of documents required by the US Bureau of Alcohol Tobacco and Firearms and

United States government and any division thereof as is require for 'novation" of government contracts.

3.03 Purchaser's Obligations at Closing. Contemporaneously with the performance by Seller of its obligations set forth in Section 3.02 above, Purchaser shall do the following at or prior to the Closing:

a. Deliver such organizational and authority documents of Purchaser as Seller may reasonably require in connection with the Closing.

b. Execute and deliver such other documents as Seller may reasonably require in connection with the Closing including, without limitation, a closing statement.

3.04 Closing Costs. Purchaser shall pay all applicable recording and transfer taxes relating to the delivery and transfer of the Acquired Assets. Except as provided in Section 6.12 below, Seller and Purchaser shall each pay their own legal fees in connection with this Agreement. Property taxes shall be prorated as of the Closing Date.

3.05 Conditions to Purchaser's Obligations. Purchaser's obligation to purchase the Acquired Assets under this Agreement is subject to the satisfaction of each of the following conditions, any of which may be waived in whole or in part only in writing by Purchaser at or prior to the Closing Date:

a. The Auction having occurred within fifteen (15) days of the execution of this Agreement by Purchaser and Seller;

b. There being no material breach of any of Seller's representations and warranties or covenants set forth in Section 4.01 below as of the Closing Date; and

c. The Seller having obtained authority to sell all assets of SDH by the Bankruptcy Court.

3.06 Conditions to Seller's Obligation. Seller's obligation to sell the Acquired Assets under this Agreement is subject to the satisfaction of each of the following conditions:

a. Purchaser being the successful bidder at the Auction and the Purchase Price being adjusted to the amount of the winning bid;

b. Purchaser having delivered to Seller the items described in Section 3.03 above and otherwise having performed its obligations under Section 3.03 above;

c. There being no material breach of any of Purchaser's representations and warranties or covenants set forth in Section 4.02 below as of the Closing Date; and

d. The Seller having obtained authority to sell all assets of SDH by the Bankruptcy Court.

567506

# ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES AND COVENANTS

        4.01      Representations and Warranties of Seller. Seller hereby represents and warrants to Purchaser, both as of the date hereof and as of the Closing Date, as follows:

a. Seller is the court-appointed Chapter 11 Trustee for SDI in Case No. 11-01431 pending in the U.S. Bankruptcy Court for the Middle District of Tennessee (the "Court").

b. Seller has, subject to Court approval, all requisite power and authority, and shall take all actions required to authorize it to consummate this Agreement; provided, however, that Seller does not currently have authority to sell the assets of SDH but shall seek authority from the Bankruptcy Court to sell those assets prior to the Auction.

c. Seller is not a "foreign person" as that term is defined in Section 1445 of the Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

        4.02      Representations and Warranties of Purchaser. Purchaser represents and warrants to Seller that Purchaser has all requisite power and authority, has taken all actions required by its organizational documents and applicable law, and has obtained all consents which are necessary to authorize or enable it to execute and deliver this Agreement. As of the date hereof, Purchaser has had reasonable access to the Acquired Assets, and to the books and records of Sabre, and no further due diligence is required as a condition of Purchaser's obligation to close the transactions contemplated by the terms of this Agreement.

# ARTICLE V.

## PROVISIONS WITH RESPECT TO DEFAULT

        5.01      Default by Seller. In the event Seller fails or refuses to perform any of its obligations under this Agreement at any time prior to the Closing when Purchaser is not in default hereunder, and if such failure shall continue for five (5) days after written notice thereof is delivered by Purchaser to Seller, Purchaser may, at its election and as its sole and exclusive remedy, terminate this Agreement. If Seller fails or refuses to perform its obligations at the Closing, Purchaser may, at its election and as its sole and exclusive remedy, either (a) terminate this Agreement, (b) bring an action to enforce specific performance of this Agreement against Seller, provided that such action is commenced within thirty (30) days after the Closing Date, or (c) exercise any other right or remedy available to purchaser at law or in equity. Notwithstanding the foregoing, the acceptance by the Seller of a Higher and Better Offer from another party for the purchase of the Property shall not be deemed a default by the Seller.

5.02     Default by Purchaser.  In the event Purchaser is the winning bidder at the Auction and fails or refuses to perform any of its obligations hereunder or fails to purchase the Acquired Assets at the Closing for any reason, except for a default by Seller as provided in Section 5.01 above or the termination by Purchaser of this Agreement pursuant to a right of termination expressly granted to Purchaser hereunder, Seller may, at its election and as its sole and exclusive remedy, either (a) terminate this Agreement, (b) bring an action to enforce specific performance of this Agreement against Seller, provided that such action is commenced within thirty (30) days after the Closing Date, or (c) exercise any other right or remedy available to purchaser at law or in equity.

## ARTICLE VI.

## MISCELLANEOUS

6.01     No Break-Up Fee.  Purchaser shall not be entitled to a Break-Up Fee in connection with this Agreement or any of the transactions contemplated herein.

6.02     Brokerage Fees and Commissions.  Neither Seller nor Purchaser has engaged a broker in connection with the transaction contemplated under this Agreement.  If any claims for brokerage commissions or fees are ever made against Seller or Purchaser in connection with this transaction, all such claims shall be handled and paid by the party whose commitments form the basis of such claims. Seller and Purchaser each agree to indemnify and hold harmless the other from and against any and all such claims or demands with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm, or corporation in connection with this Agreement or the transactions contemplated herein insofar as any such claim or demand is based upon a contract or commitment of the indemnifying party.

6.03     Access to Records.  After Closing, the Purchaser shall allow the Trustee reasonable access to the books and records relating to the business operations of Sabre as deemed necessary by the Trustee to establish, maintain or prosecute claims relating to the Retained Assets.

6.04     Notices.  Any notice to be given or to be served upon any party hereto, in connection with this Agreement, must be in writing, and may be given by Federal Express or other nationally recognized courier which provides evidence of delivery and shall be deemed to have been given and received on the next business day after any such notice, properly addressed, with overnight, priority service prepaid, is delivered to Federal Express or such other courier.  If given otherwise than as provided in the preceding sentence, any such notice shall be deemed to have been given when delivered to and received by the party to whom it is addressed. Notices given by facsimile transmission shall be deemed given and received as of the time and date set forth on the electronic confirmed receipt of transmission of the sender.  A notice delivered by the attorney for a party to this Agreement shall constitute a valid notice on behalf of that party.  Such notices shall be given to the parties hereto at the following addresses:

567506

| | |
|---|---|
| If to Seller: | Michael E. Collins, Chapter 11 Trustee<br>Manier & Herod, P.C.<br>150 Fourth Ave. N., Suite 2200<br>Nashville, TN 37219<br>Fax: (615) 242-4203 |
| If to Purchaser: | Manroy USA, LLC<br>Attn.: John Owens, President<br>201 Lonnie Crawford Blvd.<br>Scottsboro, Alabama 35769<br>Fax: (256) 259-9805 |
| With a copy to: | LANIER FORD<br>Attn.: Michael P. Johnson<br>2101 West Clinton Avenue SE, Suite 102<br>Huntsville, Alabama 35808<br>Fax (256) 382-0598 |

Any party hereto may, at any time by giving five (5) days' written notice to the other party hereto, designate any other address in substitution of the foregoing address to which such notice shall be given.

      6.05      Entire Agreement; Modification. This Agreement embodies and constitutes the entire understanding among the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

      6.06      Headings. Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

      6.07      Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their successors and assigns, provided that except as hereafter provided, no assignment shall be made by either party without the prior written consent of the other party.

      6.08      Time of Essence. Time is of the essence of this Agreement and of each covenant and agreement that is to be performed at a particular time or within a particular period of time. However, if the final date of any period which is set out in any provision of this Agreement or the Closing Date falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Tennessee, then the time of such period or the Closing Date, as the case may be, shall be extended to the next date which is not a Saturday, Sunday or legal holiday.

6.09     Multiple Counterparts; Facsimile Signatures. This Agreement may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one agreement, but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart. Signatures to this Agreement may be transmitted via facsimile and delivery thereby shall be deemed sufficient for all purposes to the same extent as would be delivery of an original signature.

6.10     Assignment by Purchaser. Purchaser shall have the right to assign this Agreement only upon the prior written consent of Seller.

6.11     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

6.12     Attorneys' Fees. Should either party hereto institute any action or proceeding in court to enforce this Agreement, including, without limitation, an action for specific performance, the prevailing party in any such action or proceeding shall be entitled to receive from the non-prevailing party all reasonable attorneys' fees and court costs in connection with such action or proceeding.

6.13     Waiver of Jury Trial. THE PARTIES TO THIS AGREEMENT WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THEM ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO ANY RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT, INSTRUMENT, OR DOCUMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

6.14     Bankruptcy Court Approval. Notwithstanding any other provision of this Agreement, in the event that this Agreement is not approved by the Bankruptcy Court, the Parties will be relieved from all obligations hereunder and shall have no liability to the other party for any damages whatsoever.

**[Remainder of page intentionally left blank]**

567506

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written; provided, however, that for the purpose of determining "the date hereof," as used in this Agreement, such date shall be the last date any of the parties hereto executes this Agreement.

**SELLER:**

MICHAEL E. COLLINS, CHAPTER 11 TRUSTEE FOR SABRE DEFENCE INDUSTRIES, LLC, a Tennessee limited liability corporation

_/s/_ _[signature]_

Date of Execution: 3/10/11

**PURCHASER:**

MANROY USA, LLC, an Alabama Limited Liability Company

By: _[signature]_ /s/
Print: JOHN OWENS
Its: PRESIDENT
Date of Execution: 3-10-2011

567506

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.